# EXHIBIT 1

# SOFTWARE DEVELOPMENT AGREEMENT

This **SOFTWARE DEVELOPMENT AGREEMENT** (the "Agreement"), is made as of January 1, 2022, (the "**Effective Date**"), between

**EQITech (SEZC) Limited**, with a registered office at 90 North Church Street, PO Box 1103, Strathvale House, 2nd Floor, George Town, Grand Cayman KY1-1102, Cayman Islands, represented by Jason Blick (the "**Client**")

and

**Beyond Enterprizes LLC.**, with a principal place of business at 1910 Thomes Ave, Cheyenne, WY, 82001, United States of America, a Wyoming Corporation, represented by Brad Yasar (the "**Provider**").

(The "Client" and the "Provider" each being also referred to herein as a "**Party**" and collectively as the "**Parties**")

WITNESSETH

**WHEREAS**, the personnel of the Provider (the "Developer(s)") has the experience and qualifications in relevant areas relating to software development and provide such expertise to other companies; and

**WHEREAS**, the Client desires to engage the Provider to provide certain services as set forth in this Agreement, and the Provider desires to provide such services to the Client pursuant and subject to the terms and conditions set forth in this Agreement for the term provided for herein.

**NOW, THEREFORE**, in consideration of the mutual promises and undertakings contained herein, and intending to be legally bound hereby, each of the Client and the Provider agree as follows:

1. Scope of the Agreement.

1.1. Client hereby engages the Provider, and the Provider accepts such engagement, to develop and maintain software products and to design, develop and implement information technology systems (the "System") supporting the Client's operations through its Developer(s) (collectively, the "Services").

1.2. The System shall be designed, developed and implemented according to Exhibit A and the timeline mutually set by the Client and the Provider following this Agreement.

2. Delivery.

2.1. System delivery shall be divided into phases. At the beginning of each phase, the detailed requirement analysis is performed by the Provider. Based on the results of the analysis the final scope of the phase is mutually agreed between Client and Provider. Within each phase (a) deliverable(s) shall be delivered by the Provider to the Client.

2.2. System development process shall be organized and executed as a project. There shall be a person responsible for the project nominated by the Client (“Client Project Manager”) and by the Provider (“Provider Project Manager”). Client Project Manager and Provider Project Manager are responsible for managing project activities.

2.3. During the System development Client may request modifications and extensions (“Change Requests”) to the system requirements as mutually agreed upon by the parties. Delivery of such requests will be guided by terms set forth in *Section 5* of this Agreement.

3. Term.

The term of this Agreement shall commence on the Effective Date and continue with full force and effect until 31st of December 2022 or until terminated earlier under Section 9 hereof (the “Term”).

4. System Acceptance.

4.1. Within each phase, the Provider shall submit deliverables to the Client for acceptance in accordance hereunder. The submission of such deliverables shall be confirmed in writing by the Provider to the Client.

4.2. The basis for the phase acceptance by the Client is phase acceptance protocol under this Section 4.

4.3. Client shall perform review, tests and acceptance tests of deliverables according to a mutually agreed upon schedule or as set forth in Exhibit A.

4.4. Client shall verify each Deliverable to meet functional requirements, performance requirements and compliance with the software development best practices.

4.5. Defects found by the Client shall be immediately reported to the Provider in writing at the address written above or any other address provided to the Client by Provider and then included in the phase acceptance protocol.

4.6. Provider shall solve defects reported by the Client in the deadlines mutually agreed between Client and Provider. Critical System Defects, as described in *Section 7.3*, that cause the system to be non-functional on the final delivery date must be corrected prior to that day without affecting the project overall schedule.

4.7. In case no Critical, Major or Moderate defects (as such terms are defined below) are found during the acceptance tests, the Client shall sign the acceptance protocol no later than four (4) working days after the completion of the test. Defect types are the following:

- Critical: The defect that results in the termination of the complete system or one or more component of the system and causes extensive corruption of the data. The failed function is unusable and there is no acceptable alternative method to achieve the required results then the severity will be stated as critical.
- Major: The defect that results in the termination of the complete system or one or more component of the system and causes extensive corruption of the data. The failed function is unusable but there exists an acceptable alternative method to achieve the required results then the severity will be stated as major.
- Moderate: The defect that does not result in the termination, but causes the system to produce incorrect, incomplete or inconsistent results then the severity will be stated as moderate.
- Minor: The defect that does not result in the termination and does not damage the usability of the system and the desired results can be easily obtained by working around the defects then the severity is stated as minor.
- Cosmetic: The defect that is related to the enhancement of the system where the changes are related to the look and field of the application then the severity is stated as cosmetic.

4.8. After the completion of all phases of the project, the Client will perform System acceptance tests. System acceptance shall be confirmed by the system acceptance protocol set forth above.

5. Fees.

5.1. The Provider's fees for providing the Services hereunder are set forth in Exhibit A (the "Fees"). Client shall pay the Fees to the Developer upon acceptance of each phase, based on the invoices submitted by the Developer, an account designated by the Developer within 5 (five) working days from the receipt of such invoice. The Client and the Provider agree that the paying bank's fees shall be for the account of the Client and the receiving bank's fees shall be for the account of the Provider.

6. Change Management.

6.1 Either party may initiate a Change Request ("CR") as a result of (including, but not limited to): a change of project scope and cost, an increase or change to project work Items or deliverables, scheduling changes, and/or technology limitations. The parties shall comply with the following procedures related to any such CR:

a. The requesting party shall submit to the other party a written request for any change in the form of a CR;

b. As soon as reasonably possible after receipt of any such CR, and in any event not more than ten (10) business days after receipt thereof, the receiving party shall provide the requesting party with a written statement offering to perform that which is consistent with the CR, or proposing modifications to the CR, or rejecting the CR. Any statement offering to perform or propose modifications to the CR will include detailed information as to the availability of resources, and the impact, if any, on the time for completion of Services or the delivery of any Deliverables and/or the cost of the Services; and,

c. Each CR shall be approved by the authorized representatives of each party and shall constitute a formal modification to and become a part of the Agreement between the parties. In no event shall the Agreement be deemed amended except through a CR explicitly approved by authorized representatives of each party in accordance with the provisions as described herein.

6.2. Each Change Request shall be estimated with respect of the cost and time of the delivery by the Provider. Change Requests shall be implemented by the Provider upon written approval of the estimations by the Client.

7. Warranty.

7.1. Provider shall fix all defects found within the system within 1 (one) month from the System acceptance.

7.2. All defects reported by the Client shall be reported in the agreed defects tracking system.

7.3. The following defects categories shall be used:

7.3.1. Category 1 – *Critical system defec*t. The defect that results in the termination of the complete system or one or more components of the system and causes extensive corruption of the data. The failed function is unusable and there is no acceptable alternative method to achieve the required results then the severity will be stated as critical.

7.3.2. Category 2 - *Major defect*. The defect that results in the termination of the complete system or one or more components of the system and causes extensive corruption of the data. The failed function is unusable but there exists an acceptable alternative method to achieve the required results then the severity will be stated as major.

7.3.3. Category 3 – *Moderate system defect*. The defect that does not result in the termination, but causes the system to produce incorrect, incomplete or inconsistent results then the severity will be stated as moderate.

7.3.4. Category 4 - *Minor defect.* The defect that does not result in the termination and does not damage the usability of the system and the desired results can be easily obtained by working around

7.3.5. Category 5 - *Cosmetic defect.* The defect that is related to the enhancement of the system where the changes are related to the look and feel of the application then the severity is stated as cosmetic.

7.4. Reaction time and defect solution delivery time depends on the defect category:

| Defect category | Response time | Temporary solution delivery | Final solution delivery |
|---|---|---|---|
| | 10:00-18:00 EET | 10:00-18:00 EET | 10:00-18:00 EET |
| Category 1 | 4 hrs. | 1 working day | 4 working days |
| Category 2 | 4 hrs. | 2 working days | 6 working days |
| Category 3 | 2 days. | - | 10 working days |

8. <u>Indemnity; Limitation on Liability</u>.

8.1. The Provider shall be responsible for, and indemnify the Client in respect of, any damage, loss or liability (whether criminal or civil) of or suffered by (including costs and expenses properly incurred in connection with any claim) the Client (or its officers or employees) in connection with any breach by the Provider or any of its Developers of the provisions of this Agreement and to the extent that such breach was not caused by the negligence or misconduct of the Client (or its officers or employees)..

8.2. The maximum liability of the Provider, Developer(s) and each of its officers, directors, shareholders, and employees, to the Client for any damages related to this Agreement shall be limited to an amount equal to 100% of the Fees paid by the Client to the Provider under this Agreement. In no event shall the Provider, Developer(s) and each of its officers, directors, shareholders, and employees, licensors, and suppliers, be liable to the Client for any lost data or content, lost profits, business interruption or for any indirect, incidental, special, consequential, exemplary or punitive damages arising out of or relating to this Agreement, even if the Provider has been advised of the possibility of such damages, and notwithstanding the failure of essential purpose of any limited remedy.

9. Termination.

9.1. The Client shall have the right to terminate this Agreement with immediate effect upon written notice, if the Provider:

9.1.1. does not comply with an obligation deemed as essential for this Agreement; or

9.1.2. is declared insolvent, bankrupt or a liquidation procedure is initiated against it; or

9.1.3. assigns its rights and obligations hereunder without the consent of the other party; or

9.1.4. continues to breach any of its obligations hereunder, after it has been warned by the other party that a new breach would entail the termination of this Agreement.

9.2. The Client shall have the right to terminate this Agreement, or to suspend it, at any time by giving to the Provider a thirty (30) day's written notice.

9.3. If the Agreement is terminated, the Provider shall return to the Client hardware infrastructure (or the amount equivalent to its book value at the moment of the Agreement termination) which was purchased for the project and included in the System development fees paid by the Client.

9.4. If this Agreement is validly terminated under this Section, notwithstanding any other provision of this Agreement, the Client will immediately be relieved of any further obligation under this Agreement with the exception of the obligation to pay to the Provider any then accrued and unpaid fees for accepted deliverables hereunder.

10. Confidentiality and Non-Solicitation.

10.1. The parties agree and acknowledge that, as a result of negotiating and performing this Agreement, each party has and will have access to certain of the other Party's Confidential Information (as defined below). Each party also understands and agrees that misuse or disclosure of that information could adversely affect the other Party's business. Accordingly, the parties agree that each party shall use and reproduce the other party's Confidential Information only to the extent necessary for the performance of this Agreement, and shall restrict disclosure of the other party's Confidential Information to its employees, affiliates, consultants, partners, advisors or independent contractors with a need to know and are subject to binding use and disclosure restrictions at least as protective as those set forth herein and shall not disclose the other party's Confidential Information to any third party without the prior written approval of the other party. Notwithstanding the foregoing, the parties may disclose Confidential Information of the other party if required to do so under law, rule, regulation or government or court order or in connection with a governmental investigation or proceeding, provided the other party has been given prior notice and the disclosing Party has used commercially reasonable efforts to safeguard against widespread dissemination. As used in this Agreement, "Confidential Information" refers to

10.1.1. the terms, conditions and existence of this Agreement;

10.1.2. each party's trade secrets, know-how, technology, software, business plans, strategies, methods or practices;

10.1.3. any other information relating to either party that is not generally known to the public, including information about either party's personnel, products, customers, marketing strategies, services or future business plans.

10.2.Notwithstanding the foregoing, "Confidential Information" specifically excludes (A) information that is now in the public domain or subsequently enters the public domain by publication or otherwise through no action or fault of the other party; (B) information that is known to either party without restriction, prior to receipt from the other party under this Agreement, from its own independent sources as evidenced by such party's written records, and which was not acquired, directly or indirectly, from the other party and not otherwise protected by an applicable confidentiality agreement; (C) information that either party receives from any third party reasonably known by such receiving party to have a legal right to transmit such information, and not under any obligation to keep such information confidential; and (D) information independently developed by either party's employees or agents without violating any obligations under this Agreement.

10.3. The Client further covenants that for the 2 (two) years period following the Term, the Client and its employees shall refrain from directly or indirectly soliciting or assisting any third party in soliciting the employment of/services from/ any person employed by or providing services for, or previously employed by or previously providing services for, the Client.

10.4. In the event of a breach of this *Section 10* by a party, the non-breaching party shall be entitled to pursue any and all remedies available to it, including but not limited to specific performance.

11. Data Protection.

11.1 The Provider agrees that if, as part of the provision of any Services, it will process personal data, it will:

11.1.1 do so in accordance with the terms of this Agreement, domestic and international legislation and regulation, and the reasonable instructions of the Client;

11.1.2. not disclose any such personal data to any third party, other than at the specific request of the Client or as required by applicable law;

11.1.3. allow its data processing facilities, procedures and documentation which relate to the processing of any personal data to be scrutinized by the Client's auditors, in order to ascertain compliance with domestic and foreign data protection legislation; and

11.1.4. have in place such technical and organizational measures as are reasonably necessary and appropriate to safeguard against the unauthorized or unlawful processing of such personal data and against accidental loss or destruction of, or damage to, such personal data.

11.2 Email communications from the following authorized representatives is recognized as written communications as per this agreement and shall also be recognized as written approval:

- For the Client:
    - ______________________________
- For the Provider:
    - Ioana Frincu ioana@beyondenterprizes.com
    - Mike Kirby mike.kirby@beyondenterprizes.com
    - Samuel Filip samuel.filip@beyondenterprizes.com

12. Access and Security

In entering any Client site and using or accessing any of the Client's equipment, facilities, premises, or personnel, the Provider must observe all of the Client's security, health and safety, administrative and other reasonable requirements and directions, as advised to the Provider from time to time.

13. Provider's Representation.

The Provider represents to the Client that the Provider and each of the Developers shall abide by and carry out during the Term all such policies and procedures as communicated, from time to time, to the Provider by the Client and that the Provider and its Developers shall act in, and use its/their best endeavours to promote and protect, the interests of the parties in accordance with the general policy and directions of the Client.

Further, the Provider represents and warrants to the Client that:

13.1. the Provider is a corporation incorporated in accordance with the laws of Wyoming;

13.2. the Provider has validly executed this Agreement and it is and shall be binding upon and enforceable against the Provider;

13.3. the Provider has all material licenses, permissions, authorizations and consents required for the carrying out of its business in the places and in the manner in which the business is now carried out and as required by the applicable laws, regulations, rules or other decrees or orders applicable to the Provider;

13.4. There are no liquidation or bankruptcy proceedings pending against the Provider, no petition has been presented, and no decision has been made on the final accounting of the Provider. No trustee in bankruptcy, liquidator, person in charge of winding-up or another person with similar rights has been appointed with respect to the Provider or its assets;

13.5. by entering into this Agreement and performing the Services, the Provider shall not be in breach of any contract or other obligation; and

13.6. the Provider will assume all responsibility for the actions/omissions of its Developers and Providers within the scope of this Agreement;

13.7. any change of control over the beneficial ownership of the shares in the Provider, voting rights or otherwise in or relating to the Provider will be notified to the Client by a prior one month's written notice.

13.8 the provider warrants that it has the skills, experience and resources to deliver services and will use its best endeavors throughout.

The Client represents and warrants that: (i) it is duly organized and has the full right, authority and ability to enter into this Agreement; (ii) it has not and shall not undertake any actions which might adversely affect or impair any of the Provider's rights hereunder; and (d) it will use the System and any Deliverables provided by the Provider hereunder in strict accordance with this Agreement and all applicable laws, statutes, ordinances, rules, regulations and other government requirements.

14. Intellectual Property, etc.

Any intellectual property, computer software or other intangible item developed by the Provider or any of its Developers or under its/their supervision arising out of the Services hereunder during the Term shall be owned by, transferred to and be on account for the Client, and the Provider hereby assigns and transfers, and undertakes to take any and all further actions requested by the Client in order to assign and transfer, ownership and all other rights to the above to the Client (or any other party designated by the Client) upon full payment of all services under this agreement.

15. Severability.

If any term or provision of this Agreement or part thereof shall to any extent be or become invalid or unenforceable, then

i. the remaining terms and provisions of this Agreement shall be unimpaired and shall remain in full force and effect and

Ii. the invalid term or provision shall be replaced by a term or provision that is valid, enforceable and that comes closest to the intention of such invalid or unenforceable term or provision.

16. Counterparts.

This Agreement may be executed in several counterparts, each of which shall be an original (including electronic copies), but all of which together shall constitute one and the same Agreement.

17. Force Majeure.

Notwithstanding anything to the contrary contained in this Agreement, neither party will incur any liability to the other party, or to any other person or entity, with respect to any failure of either party, as the case may be, to perform any of its obligations under this Agreement in the event that the failure is due to or arises out of: (i) any act of God; (ii) any act of a public enemy; (iii) any act of any local, county, state, federal or other government in its sovereign or contractual capacity; (iv) any act of war or terrorism; (v) any riot; (vi) any fire, flood or adverse weather condition; (vii) any epidemic or quarantine; (viii) any act of sabotage; (ix) any strike, lock-out or other labor

Beyond ENTERPRIZES

disturbance; or (x) any other cause beyond the reasonable control of either party (each, a "Force Majeure Event"), and such non-performance will be excused for the period of time that such failure(s) causes non-performance.

18. Miscellaneous.

18.1. Unless otherwise explicitly provided for herein, this Agreement and its exhibits represent the entire understanding and agreement between the parties and supersede all prior negotiations, representations and agreements made by and between them. No alteration, amendment or modification of any of the terms or provisions of this Agreement shall be valid unless made pursuant to an instrument in writing (whether in one or several language versions) and duly signed by each Party.

18.2. This Agreement may be amended or modified only by a written instrument that is executed by both parties and that specifically identifies the provision(s), and section(s), of this Agreement being amended.

18.3. Each party recognizes that this is a legally binding contract and acknowledges and agrees that they have had the opportunity to consult with legal counsel of their choice. Each party has cooperated in the drafting, negotiation and preparation of this Agreement. Hence, in any construction to be made of this Agreement, the same shall not be construed against either party on the basis of that party being the drafter of such language.

19. Governing Law, Arbitration.

This Agreement shall be governed and construed in accordance with the substantive laws of California.

**WHEREUPON**, each of the parties have executed this Agreement on the date first above written.

| **Beyond Enterprizes, LLC.** | **EQITech SEZC Limited** |
|---|---|
| Brad Yasar | [signature] |
| By: Brad Yasar | By: Jason Blick |
| Title: Founder & President | Title: Director |

Beyond ENTERPRIZES

**EXHIBIT A**

**Project Name: EQIBank Management System and Banking as a Service Infrastructure**

# EQIBank Management System ("EMS")

Technology stack:

- Javascript (NodeJS, React)
- TypeScript
- Amazon Web Services
- Docker
- Kafka

Phase 1:

- Deadline: May 1st, 2022
- Scope: Replace the existing EQIcm implementation used by EQIBank staff to manage bank account applications
- Components:
    - Natural Persons & Corporate Onboarding forms
    - Differentiation between BaaS clients for application
    - CRM System to manage Account applications
    - Integrations:
        - Veriff
    - Amazon Web Services deployment

Phase 2:

- Deadline: September 1st, 2022
- Data recovery from EQIcm for encripted documents
- Data import of clients from Cognito forms, Monday.com, EQIcm and BankWare
- API end point for transferring clients' data to AMLTrack
- API endpoint for ViaCarte connection from EMS
- Various changes requested by EQIBank compliance team to EMS

Phase 3:

- Deadline: December 15th, 2022
- VIacarte connection with EQIBank

Beyond ENTERPRIZES

- AMLTrac connection to EQIBank
- Components:
    - Payment Routing algorithm
    - Payment placement from
    - 3rd party integrations with:
        - Thunes for payment automation
        - Verifo for payment automation
        - Clarency for payment automation
        - Bankware for payment placement and client update
        - Viacarte
    - Various changes to EMS requested by the compliance team

## Banking as a Service ("BaaS")

Phase 1:

- Deadline: January 1st 2023
- Platform: web (mobile-compatible)
- Backend Infrastructure for supporting multiple tenants (one for each BaaS client)
- Internet Banking interface for users to manage bank accounts
- Bank account detail view
- Payments placement
- Amazon Web Services deployment

Prerequisites for BaaS Phase 1:

- Core Banking update to the latest version from iFinancial
- Updated API information and support from iFinancial for using Bankware
- Viacarte API connections

Phase 2:

- Deadline: to be mutually agreed
- Mobile Internet Banking
- Platforms: iOS & Android
- Technology: Swift, Kotlin
- Apple Store launch
- Google Play launch

## Costs Estimate

Costs shall not exceed $100,000 per month unless otherwise agreed to in writing and the Provider shall provide the Client with a full and detailed breakdown of all resources, personnel and hours worked monthly and will ensure a full complement of staff are engaged on the Project at all times.

Dropbox Sign

# Audit trail

| | |
|---|---|
| Title | Beyond Enterprizes EQIBANK SOFTWARE DEV AGMT 2022-01-01... |
| File name | Beyond Enterprize... 2023-02-15).docx |
| Document ID | 680dcc9ad41311141724d480808c48dbbd1634d7 |
| Audit trail date format | MM / DD / YYYY |
| Status | Signed |

## Document history

| | | |
|---|---|---|
| SENT | **02 / 16 / 2023** 18:07:50 UTC | Sent for signature to Jason Blick (j.blick@eqibank.com) and Brad Yasar (brad@beyondenterprizes.com) from adam@arkorion.ca IP: 207.216.80.163 |
| VIEWED | **02 / 16 / 2023** 18:08:34 UTC | Viewed by Jason Blick (j.blick@eqibank.com) IP: 172.56.121.35 |
| SIGNED | **02 / 16 / 2023** 18:08:51 UTC | Signed by Jason Blick (j.blick@eqibank.com) IP: 172.56.121.35 |
| VIEWED | **02 / 23 / 2023** 18:34:03 UTC | Viewed by Brad Yasar (brad@beyondenterprizes.com) IP: 47.150.34.182 |
| SIGNED | **02 / 23 / 2023** 18:47:20 UTC | Signed by Brad Yasar (brad@beyondenterprizes.com) IP: 47.150.34.182 |
| COMPLETED | **02 / 23 / 2023** 18:47:20 UTC | The document has been completed. |