# EXHIBIT 2

**PRODUCTION SUPPORT AGREEMENT**

This **PRODUCTION SUPPORT AGREEMENT** (the "Agreement"), is made as of October 1, 2024, (the "**Effective Date**"), between:

**EQIBank Limited**, with a principal place of business at 24 Hillsborough Street, Suite II, Roseau, Commonwealth of Dominica, represented by Roman Drach (the "**Client**")

and

**Beyond Enterprizes LLC.**, with a principal place of business at 1910 Thomes Ave, Cheyenne, WY, 82001, United States of America, a Wyoming Corporation, represented by Brad Yasar (the "**Provider**" or "**Beyond**").

(The "Client" and the "Provider" each being also referred to herein as a "Party" and collectively as the "**Parties**")

WITNESSETH

**WHEREAS**, the Provider has the experience and qualifications in relevant areas relating to production support and provide such expertise to other companies; and

**WHEREAS**, the Client desires to engage the Provider to provide certain services as set forth in this Agreement, and the Provider desires to provide such services to the Client pursuant and subject to the terms and conditions set forth in this Agreement for the term provided for herein.

**NOW, THEREFORE**, in consideration of the mutual promises and undertakings contained herein, and intending to be legally bound hereby, each of the Client and the Provider agree as follows:

1. Scope of the Agreement.

1.1. Client hereby engages the Provider, and the Provider accepts such engagement, to maintain software products (the "System") supporting the Client's operations through its Developers (collectively, the "Services").

1.2. The System shall be supported according to Exhibit A and the timeline mutually set by the Client and the Provider following this Agreement.

2. Delivery.

2.1. System delivery shall be ongoing with a combination of hot-fix deployments and scheduled releases of bug fixes. The detailed requirement analysis is performed by the Provider. Based on the results of the analysis the final scope of the remediation is mutually agreed between Client and Provider.

2.2. There shall be a person responsible for the verifying and reporting of bugs assigned by the Client (“**Client Production Support Manager**”) and by the Provider (“**Provider Production Support Manager**”). The Client Production Support Manager and Provider Production Support Manager are responsible for managing all production issues and will be identified upon execution of this agreement..

3. Term.

The term of this Agreement shall commence on the Effective Date and continue with full force and effect until terminated under Section 8 hereof (the “**Term**”).

4. Delivery Acceptance.

4.1. For each defect, the Provider shall submit deliverables to the Client for acceptance in accordance hereunder. The submission of such deliverables shall be confirmed in writing by the Provider to the Client through the agreed upon defect tracking system.

4.2. The basis for the phase acceptance by the Client is phase acceptance protocol under this Section 4.

4.3. Client shall review and perform acceptance tests of deliverables according to a mutually agreed upon schedule or as set forth in Exhibit A.

4.4. Client shall verify each Deliverable to meet functional requirements. Conformity with performance requirements and compliance with the software development best practices is ensured by the Provider.

4.5. Defects found by the Client shall be immediately reported to the Provider in writing at the address written above or any other address provided to the Client by Provider and then included in the phase acceptance protocol.

5. Fees.

5.1. The Provider’s fees for providing the Services hereunder are set forth in Exhibit A (the “Fees”). Client shall pay the Fees to the Provider at the beginning of each month, based on the invoices submitted by the Provider, within 10 (ten) working days from the receipt of such invoice. The Client and the Provider agree that each is responsible for paying any banking fees imposed by their respective bank..

6. Scope.

6.1. All defects reported by the Client shall be reported in the agreed defect tracking system.

6.2. The following defects categories shall be used:

6.3.1. Highest – *Critical system defec*t. The defect results in the termination of the complete system or one or more components of the system and causes extensive corruption of the data. The failed function is unusable and there is no acceptable alternative method to achieve the required results.

6.3.2. High - *Major defect*. The defect results in the termination of the complete system or one or more components of the system and causes extensive corruption of the data. The failed function is unusable but there exists an acceptable alternative method to achieve the required results.

6.3.3. Medium – *Moderate system defect*. The defect that does not result in system termination, but causes the system to produce incorrect, incomplete or inconsistent results.

6.3.4. Low - *Minor defect.* The defect does not result in system termination and does not damage the usability of the system and the desired results can be easily obtained by a work around.

6.3.5. Lowest - *Cosmetic defect.* The defect that is related to the look and feel of the application such as a misspelling.

6.4. Reaction time and defect solution delivery time depends on the defect category:

| Defect category | Response time | Temporary solution delivery | Final solution delivery |
|---|---|---|---|
| | 09:00-17:00 EST | 09:00-17:00 EST | 09:00-17:00 EST |
| Highest | 4 hrs. | 1 working day | 4 working days |
| High | 4 hrs. | 2 working days | 6 working days |
| Medium | 2 days. | - | 10 working days |
| Low/Lowest | 2 days. | - | 10 working days |

7. Indemnity; Limitation on Liability.

7.1. The Provider shall be responsible for, and indemnify the Client in respect of, any damage, loss or liability (whether criminal or civil) of or suffered by (including costs and expenses properly incurred in connection with any claim) the Client (or its officers or employees) in connection with any breach by the Provider or any of its Developers of the provisions of this Agreement and to the extent that such breach was not caused by the negligence or misconduct of the Client (or its officers or employees)..

7.2. The maximum liability of the Provider, Developer(s) and each of its officers, directors, shareholders, and employees, to the Client for any damages related to this Agreement shall be limited to an amount equal to 100% of the Fees paid by the Client to the Provider under this Agreement. In no event shall the Provider, Developer(s) and each of its officers, directors, shareholders, and employees, licensors, and suppliers, be liable to the Client for any lost data or content, lost profits, business interruption or for any indirect, incidental, special, consequential, exemplary or punitive damages arising out of or relating to this Agreement, even if the Provider has been advised of the possibility of such damages, and notwithstanding the failure of essential purpose of any limited remedy.

8. Termination.

8.1. The Client shall have the right to terminate this Agreement with immediate effect upon written notice, if the Provider:

8.1.1. does not comply with an obligation deemed as essential for this Agreement; or

8.1.2. is declared insolvent, bankrupt or a liquidation procedure is initiated against it; or

8.1.3. assigns its rights and obligations hereunder without the consent of the other party; or

8.1.4. continues to breach any of its obligations hereunder.

8.2. The Provider and Client have the right to terminate this Agreement by providing written thirty (30) days notice to the other Party

8.3. If this Agreement is validly terminated under this Section, notwithstanding any other provision of this Agreement, the Client will immediately be relieved of any further obligation under this Agreement with the exception of the obligation to pay to the Provider any then accrued and unpaid fees for accepted deliverables hereunder.

9. Confidentiality and Non-Solicitation.

9.1. The parties agree and acknowledge that, as a result of negotiating and performing this Agreement, each party has and will have access to certain of the other Party's Confidential Information (as defined below). Each party also understands and agrees that misuse or disclosure of that information could adversely affect the other Party's business. Accordingly, the

parties agree that each party shall use and reproduce the other party's Confidential Information only to the extent necessary for the performance of this Agreement, and shall restrict disclosure of the other party's Confidential Information to its employees, affiliates, consultants, partners, advisors or independent contractors with a need to know and are subject to binding use and disclosure restrictions at least as protective as those set forth herein and shall not disclose the other party's Confidential Information to any third party without the prior written approval of the other party. Notwithstanding the foregoing, the parties may disclose Confidential Information of the other party if required to do so under law, rule, regulation or government or court order or in connection with a governmental investigation or proceeding, provided the other party has been given prior notice and the disclosing Party has used commercially reasonable efforts to safeguard against widespread dissemination. As used in this Agreement, "Confidential Information" refers to

9.1.1. the terms, conditions and existence of this Agreement;

9.1.2. each party's trade secrets, know-how, technology, software, business plans, strategies, methods or practices;

9.1.3. any other information relating to either party that is not generally known to the public, including information about either party's personnel, products, customers, marketing strategies, services or future business plans.

9.2. Notwithstanding the foregoing, "Confidential Information" specifically excludes (A) information that is now in the public domain or subsequently enters the public domain by publication or otherwise through no action or fault of the other party; (B) information that is known to either party without restriction, prior to receipt from the other party under this Agreement, from its own independent sources as evidenced by such party's written records, and which was not acquired, directly or indirectly, from the other party and not otherwise protected by an applicable confidentiality agreement; (C) information that either party receives from any third party reasonably known by such receiving party to have a legal right to transmit such information, and not under any obligation to keep such information confidential; and (D) information independently developed by either party's employees or agents without violating any obligations under this Agreement.

9.3. The Client further covenants that for the 2 (two) years period following the Term, the Client and its employees shall refrain from directly or indirectly soliciting or assisting any third party in soliciting the employment of/services from/ any person employed by or providing services for, or previously employed by or previously providing services for, the Client.

9.4. In the event of a breach of this *Section 9* by a party, the non-breaching party shall be entitled to pursue any and all remedies available to it, including but not limited to specific performance.

10. Data Protection.

The Provider agrees that if, as part of the provision of any Services, it will process personal data, it will:

10.1. do so in accordance with the terms of this Agreement, domestic and international legislation and regulation, and the reasonable instructions of the Client;

10.2. not disclose any such personal data to any third party, other than at the specific request of the Client or as required by applicable law;

10.3. allow its data processing facilities, procedures and documentation which relate to the processing of any personal data to be scrutinized by the Client's auditors, in order to ascertain compliance with domestic and foreign data protection legislation; and

10.4. have in place such technical and organizational measures as are reasonably necessary and appropriate to safeguard against the unauthorized or unlawful processing of such personal data and against accidental loss or destruction of, or damage to, such personal data.

11. Access and Security

In entering any Client site and using or accessing any of the Client's equipment, facilities, premises or personnel, the Provider must observe all of the Client's security, health and safety, administrative and other reasonable requirements and directions, as advised to the Provider from time to time.

12. Provider's Representation.

The Provider represents to the Client that the Provider and each of the Developers shall abide by and carry out during the Term all such policies and procedures as communicated, from time to time, to the Provider by the Client and that the Provider and its Developers shall act in, and use its/their best endeavors to promote and protect, the interests of the parties in accordance with the general policy and directions of the Client.

Further, the Provider represents and warrants to the Client that:

12.1. the Provider is a corporation incorporated in accordance with the laws of Wyoming;

12.2. the Provider has validly executed this Agreement and it is and shall be binding upon and enforceable against the Provider;

12.3. the Provider has all material licenses, permissions, authorizations and consents required for the carrying out of its business in the places and in the manner in which the business is now carried out and as required by the applicable laws, regulations, rules or other decrees or orders applicable to the Provider;

12.4. There are no liquidation or bankruptcy proceedings pending against the Provider, no petition has been presented, and no decision has been made on the final accounting of the Provider. No trustee in bankruptcy, liquidator, person in charge of winding-up or another person with similar rights has been appointed with respect to the Provider or its assets;

12.5. by entering into this Agreement and performing the Services, the Provider shall not be in breach of any contract or other obligation; and

12.6. the Provider will assume all responsibility for the actions/omissions of its Developers and Providers within the scope of this Agreement;

12.7. any change of control over the beneficial ownership of the shares in the Provider, voting rights or otherwise in or relating to the Provider will be notified to the Client by a prior one month's written notice.

The Client represents and warrants that: (i) it is duly organized and has the full right, authority and ability to enter into this Agreement; (ii) it has not and shall not undertake any actions which might adversely affect or impair any of the Provider's rights hereunder; and (d) it will use the System and any Deliverables provided by the Provider hereunder in strict accordance with this Agreement and all applicable laws, statutes, ordinances, rules, regulations and other government requirements.

13. Intellectual Property, etc.

Any intellectual property, computer software or other intangible item developed by the Provider or any of its Developers or under its/their supervision arising out of the Services hereunder during the Term shall be owned by, transferred to and be on account for the Client, and the Provider hereby assigns and transfers, and undertakes to take any and all further actions requested by the Client in order to assign and transfer, ownership and all other rights to the above to the Client (or any other party designated by the Client) upon full payment of all services under this agreement.

14. Severability.

If any term or provision of this Agreement or part thereof shall to any extent be or become invalid or unenforceable, then

i. the remaining terms and provisions of this Agreement shall be unimpaired and shall remain in full force and effect and

ii. the invalid term or provision shall be replaced by a term or provision that is valid, enforceable and that comes closest to the intention of such invalid or unenforceable term or provision.

15. Counterparts.

This Agreement may be executed in several counterparts, each of which shall be an original (including electronic copies), but all of which together shall constitute one and the same Agreement.

16. Force Majeure.
Notwithstanding anything to the contrary contained in this Agreement, neither party will incur any liability to the other party, or to any other person or entity, with respect to any failure of either party, as the case may be, to perform any of its obligations under this Agreement in the event that the failure is due to or arises out of: (i) any act of God; (ii) any act of a public enemy; (iii) any act of any local, county, state, federal or other government in its sovereign or contractual capacity; (iv) any act of war or terrorism; (v) any riot; (vi) any fire, flood or adverse weather condition; (vii) any epidemic or quarantine; (viii) any act of sabotage; (ix) any strike, lock-out or other labor disturbance; or (x) any other cause beyond the reasonable control of either party (each, a "Force Majeure Event"), and such non-performance will be excused for the period of time that such failure(s) causes non-performance.

17. Miscellaneous.
17.1. Unless otherwise explicitly provided for herein, this Agreement and its exhibits represent the entire understanding and agreement between the parties and supersede all prior negotiations, representations and agreements made by and between them. No alteration, amendment or modification of any of the terms or provisions of this Agreement shall be valid unless made pursuant to an instrument in writing (whether in one or several language versions) and duly signed by each Party.
17.2. This Agreement may be amended or modified only by a written instrument that is executed by both parties and that specifically identifies the provision(s), and section(s), of this Agreement being amended.
17.3. Each party recognizes that this is a legally binding contract and acknowledges and agrees that they have had the opportunity to consult with legal counsel of their choice. Each party has cooperated in the drafting, negotiation and preparation of this Agreement. Hence, in any construction to be made of this Agreement, the same shall not be construed against either party on the basis of that party being the drafter of such language.

18. Governing Law, Arbitration.
This Agreement shall be governed and construed in accordance with the substantive laws of California.

**WHEREUPON**, each of the parties have executed this Agreement on the date first above written.

**Beyond Enterprizes, LLC.**

Brad Yasar

By: Brad Yasar
Title: Founder

**EQIBank Limited**

Jason Blick

By: Jason Blick
Title: CEO

Beyond ENTERPRIZES

**EXHIBIT A**

**Project Name: EQIBank Production Support**

Requirements:
Beyond will provide the break/fix support for the following Systems**:**

1) EQIBank Portal: The public facing website used for submitting applications for clients wishing to open an account directly with EQIBank

2) EQIBank Management System: The website used by EQIBank staff used for application processing, OTC Requests, User and Role Management and Payment tracking

3) EQIBank Internet Banking Portal: The public facing website used by EQIBank clients to view and manage their bank accounts

4) 3rd Party APIs: This includes Veriff, IFS (Bankware and AMLTrac) and ViaCarte. Any re-engineering of API integrations due to changes by 3rd party providers are not considered break/fix and will require a separate scope of work/fee schedule.

New feature development, system enhancements, process-flow improvements and changes to look and feel other than grammatical fixes are not included in the scope of this Agreement with the following exceptions:

1) Conduct an investigation of the following production issues and implement corresponding fixes (where such fixes are possible to implement):

| Summary | Issuekey |
|---|---|
| Corporate applications - multiple Veriff initiations | EBIT-173 |
| Application form and EMS - file size issue | EBIT-176 |

Beyond ENTERPRIZES

| | |
|---|---|
| Application - missing authorised signatory section | EBIT-153 |
| EBIT 167 - When does the viacarte user ID gets populated into EMS | ENP-1613 |
| Email notification of expired documents | EBIT-44 |
| Payment Status in EMS system doesn't show "Paid" | EBIT-16 |
| Update Production Bankware IDs based on list from Chris. | ENP-1412 |
| EMS \| FE \| Hide export info button for applications with status beside Prospect and onwards | ENP-1365 |
| EMS - System wrongfully sending notifications to clients | EBIT-84 |
| Application form Individual - Save button | EBIT-210 |
| EMS staging - submitted application (individual) status | EBIT-211 |
| Application Form - fields validation | EBIT-212 |
| EMS - Corp - Documents | EBIT-239 |

2) Implement a process flow change to reduce the quantity of API calls to the core banking engine which is limited to the enhancements described here.

Beyond ENTERPRIZES

3) Process flow changes for managing ViaCarte cards from the Internet banking portal which is limited to:

1. Request Corporate Card During the Application
2. Apply for a card from within the Internet Banking portal
3. Ensure card's are visible to the user it was assigned
4. Automate the bank account transactions for funding a card

Fees:

Beyond's fee for the services outlined above will be $25,000 per month, to be paid prior to the beginning of the month in which the Agreement will commence.

# Signature Certificate

Reference number: 2BPVQ-6GMQD-QCA5Q-87J3Q

| Signer | Timestamp | Signature |
|---|---|---|
| **Jason Blick**<br>Email: j.blick@eqibank.com | |  |
| Sent: | 10 Sep 2024 23:38:02 UTC | |
| Viewed: | 10 Sep 2024 23:43:44 UTC | |
| Signed: | 11 Sep 2024 18:38:41 UTC | |
| **Recipient Verification:** | | IP address: 104.28.85.109 |
| ✔Email verified | 10 Sep 2024 23:43:44 UTC | Location: Los Angeles, United States |
| **Brad Yasar**<br>Email: brad@eqifi.com<br>Shared via link | |  |
| Sent: | 10 Sep 2024 23:38:02 UTC | |
| Viewed: | 11 Sep 2024 18:56:27 UTC | IP address: 104.173.205.105 |
| Signed: | 11 Sep 2024 18:56:35 UTC | Location: Los Angeles, United States |

Document completed by all parties on:

11 Sep 2024 18:56:35 UTC

Page 1 of 1

**Signed with PandaDoc**

PandaDoc is a document workflow and certified eSignature solution trusted by 50,000+ companies worldwide.