# EXHIBIT 3

**EQICORP LIMITED**

**SUBSCRIPTION AGREEMENT**
**0% Convertible Debentures**

**TO:** EQICORP Limited, (the "**Company**") a limited liability company having its registered office at Strathvale House, 90 North Church Street, P. O. Box 1103, KY1-1102 George Town, Grand Cayman

**RE:** Private placement of up to 500,000 Debentures of US$1 each in the aggregate principal amount of up to US Dollars USD$500,000 (the "**Offering**")

## DETAILS OF SUBSCRIPTION

The undersigned (the "**Subscriber**") hereby irrevocably subscribes for and agrees to purchase from the Company, subject to the terms and conditions set forth in this subscription agreement (this "**Subscription Agreement**"), that number of secured convertible Debentures of the Company ("**Debentures**") set out below, at the subscription price of USD$1 per Debenture (the "**Subscription Price**"). Each Debenture shall bear interest at a rate of 0% per annum, payable as set out herein after the closing of the Offering (the "**Closing**") and maturing on the third-year anniversary of Closing (the "**Maturity Date**"). The Subscriber agrees to be bound by the terms and conditions set forth in the attached "Terms and Conditions of Subscription for Debentures" in **Schedule A** to this Subscription Agreement, as well as the acknowledgements, representations, warranties and covenants set forth in Schedule A and the other Schedules attached hereto (each a "**Schedule**" and collectively, the "**Schedules**"), as applicable. This subscription is subject to acceptance or rejection by the Company in its sole discretion and may be accepted as to the number of Debentures set out below or such lesser number as may be determined by the Company.

The terms of the Debentures are set out in the term sheet attached as **Schedule B** to this Subscription Agreement (the "**Term Sheet**").

If, prior to the Closing, any change is made to the Loan Document such that it is not materially consistent with the Term Sheet, and such change would reasonably be expected to materially and adversely affect a Subscriber's decision to invest in Debentures, the Company will notify the Subscriber in writing of such change promptly. A Subscriber, in such event, will be entitled to withdraw its subscription by written notice to the Company no later than midnight (Cayman Islands time) on the second business day after receipt by the Subscriber of such written notice of the change.

Certain representations and warranties to be made by the Subscriber so that the Company can ensure compliance with applicable laws, including securities laws, are set out in the Schedules, and all Schedules are hereby incorporated herein and form a part of this Subscription Agreement. All capitalized terms used but not otherwise defined in the Schedules have the meanings ascribed thereto in this Subscription Agreement or the Term Sheet, as applicable. All dollar amounts herein refer to US dollars unless otherwise specified. The expressions "hereof", "hereto", "hereunder", "herein" and similar expressions mean and refer to this Subscription Agreement (including the Schedules) in their entirety.



Doc ID: fe2e47e1a2bfb288c303fba5eaee6e5bd7ae9918

**SUBSCRIPTION INSTRUCTIONS:**

1. Carefully review this Subscription Agreement, including the terms, conditions, representations, warranties and covenants set out herein.

2. Deleted.

3. If the Subscriber is a U.S. Person (as such term is defined in Regulation S to the *United States Securities Act of 1933*, as amended) or otherwise qualifies as a U.S. taxable investor, the Subscriber must ***additionally*** review and complete **Schedule D** and its appendices (and make the representations, warranties and covenants set out therein).

4. Deleted.

5. Return the completed Subscription Agreement to the Company by email to Jason Blick (j.blick@eqibank,com), with CC to Adam Kniec (a.kniec@eqibank.com).

6. Deliver payment of Subscription Proceeds in kind as detailed in section "Payment of Subscription Proceeds" of the Term Sheet in Schedule B below.

A fully completed Subscription Agreement must be received by the Company no later than 4:00 p.m. (New York time) one business day prior to Closing (the "**Subscription Deadline**").

***Please print all information (other than signatures), as applicable, in the spaces provided below.***

**Beyond Enterprizes LLC**

(Name of Subscriber)

By: [signature]

Authorized Signature

**Director**

(Official Capacity or Title – please print)

**Bulent Brad Yasar**

Please print name of individual whose signature appears above if different than the name of the subscriber printed above.

**1910 Thomas Av, Cheynne, WY 82001 USA**

(Subscriber's Address, including Municipality and Province)

**+1 (310) 600-9704**

(Telephone Number)

**Brad Yasar (brad@beyondenterprizes.com)**

(E-mail Address)

**Number of Debentures (denominations of US$1 each): five hundred thousand (500,000)**

**Aggregate Subscription Price: USD$ 500,000**

**If the person signing this Subscription Agreement is signing as agent for one or more beneficial purchasers and is not a trust company or a trust Company acting on behalf of a fully managed account managed by it or a person acting on behalf of a fully managed account managed by it, you must complete the following and ensure that the attached schedules are completed on behalf of each beneficial purchaser.**

N/A

(Name of Principal)

N/A

(Principal's address)

N/A

(Telephone Number)

(E-mail Address)



Doc ID: fe2e47e1a2bfb288c303fba5eaee6e5bd7ae9918

**A C C E P T A N C E**

The foregoing is acknowledged, accepted and agreed to this 3rd day of February, 2022.

**EQICORP Limited**

by: Christopher Burke

**CHRISTOPHER BURKE, DIRECTOR**



Doc ID: fe2e47e1a2bfb288c303fba5eaee6e5bd7ae9918

**SCHEDULE A**
**TERMS AND CONDITIONS OF SUBSCRIPTION**

## 1. Conditions of Closing

In consideration of the Company accepting this Subscription Agreement and conditional thereon, the Subscriber on its behalf and, if applicable, on behalf of others for whom it is contracting under this Subscription Agreement (if any):

(a) agrees to complete, execute and deliver and agrees to cause any purchaser for whom it is acting to complete, execute and deliver to the Company all relevant documents required by applicable securities legislation, as the sale of the Debentures will not be qualified by a prospectus or similar document filed in any jurisdiction and the Debentures will be subject to resale restrictions under such securities legislation and related policies;

(b) understands that if the Subscriber is not purchasing the Debentures as principal for its own account, in the absence of an available exemption, each beneficial purchaser who is acquiring the Debentures as principal for its own account must ensure the availability of an exemption from the prospectus requirements of applicable securities legislation with respect to such purchase, and each such purchaser, and not the Subscriber (unless the Subscriber is an authorized agent with power to sign on behalf of the beneficial purchaser), must execute all relevant documentation, including this Subscription Agreement and all documentation required by applicable securities legislation with respect to the Debentures being acquired by each such purchaser as principal;

(c) acknowledges that there is no market for the Debentures, and that their transfer or resale is subject to certain restrictions pursuant to the Definitive Documentation and applicable laws;

(d) the Subscriber is aware that there is an indefinite hold period imposed by applicable securities laws in respect of the Debentures and that the Debentures and any securities issued upon conversion thereof may only be sold in compliance with applicable securities laws. The Subscriber shall comply with all such resale restrictions. The Subscriber is aware that the certificates representing the Debentures may bear one or more restrictive legends.

(e) subject to the agreement of the Company, the transactions contemplated by the Offering may close in one or more subsequent tranches following the initial Closing;

(f) agrees that the Subscriber's representations and warranties contained in Section 2 of this Subscription Agreement (and in the applicable Schedules hereto) must be true and correct at the Closing of the purchase and sale of the Debentures as if made at such time and date, having given effect to the transactions contemplated by this Subscription Agreement;

(g) acknowledges that the Subscriber has been provided with and has reviewed a copy of this Subscription Agreement (being hereinafter referred to as the "**Principal Documents**") and in purchasing the Debentures has relied solely on the Principal Documents and not upon any oral or written representation as to any fact or otherwise made by or on behalf of the Company, any associate or affiliate of the Company, or any other person;

(h) acknowledges that certain of the principals of the Company, including its directors and officers, currently manage or are involved with other investments and business ventures which may be similar in nature to, or competitive with, the Company and may have financial and other incentives to treat such other such other investment or business ventures differently from the Company;

(i) acknowledges that the Debentures have not been and will not be registered under any Canadian or United States or Cayman Islands securities laws;



Doc ID: fe2e47e1a2bfb288c303fba5eaee6e5bd7ae9918

(j) acknowledges that the Subscriber has been advised to consult its own legal, investment and tax advisors with respect to the merits, risks and consequences of an investment in the Debentures and applicable resale restrictions;

(k) acknowledges that the Subscriber is responsible for obtaining such legal investment and tax advice as the Subscriber considers appropriate in connection with the execution, delivery and performance by the Subscriber of this Subscription Agreement and the transactions contemplated hereby;

(l) acknowledges that the offer made by this Subscription Agreement is irrevocable but does not require acceptance by the Company; and

(m) acknowledges that no agency, governmental authority, regulatory body, stock exchange or other entity has made any finding or determination as to the merit of investment in, nor have any such agencies or governmental authorities made any recommendation or endorsement with respect to, the Debentures or the Principal Documents.

**2. Representations, Warranties, Covenants and Acknowledgements of the Subscriber**

The Subscriber on its behalf and, if applicable, on behalf of others for whom it is contracting under this Subscription Agreement (if any), hereby represents and warrants to the Company as follows, and acknowledges that the Company is relying upon such representations and warranties in connection with the issuance and sale of Debentures to the Subscriber:

(a) if an individual, the Subscriber is of the age of majority and has the capacity and competence to enter into and be bound by this Subscription Agreement and all other agreements contemplated hereby or in the other Principal Documents, and this Subscription Agreement constitutes a legal, valid and binding agreement enforceable against the Subscriber in accordance with its terms;

(b) if the Subscriber is an entity:

  (i) the Subscriber is a valid and subsisting entity under the laws of the jurisdiction of its formation and is in good standing (or equivalent) thereunder;

  (ii) the Subscriber has the capacity and authority to execute and deliver this Subscription Agreement and to observe and perform its obligations hereunder;

  (iii) this Subscription Agreement has been duly authorized, executed and delivered by the Subscriber;

  (iv) the execution and delivery of this Subscription Agreement by the Subscriber will not result in the violation of, or constitute a default under, or conflict with or cause the acceleration of any obligation of the Subscriber under (a) any contract to which the Subscriber is a party or by which it is bound; (b) any provision of the constating or similar documents of the Subscriber; or (c) any judgment, decree, order or award of any court, government body or arbitrator having jurisdiction over the Subscriber;

  (v) the Subscriber is in compliance with all applicable Anti-Money Laundering Laws (as defined below) and, if legally required to maintain anti-money laundering policies does so as required;

(c) the Subscriber is resident in the jurisdiction indicated on the second page of this Subscription Agreement, and if the Subscriber is acting as agent for a disclosed principal, the disclosed principal is resident in the jurisdiction set out on the second page of this Subscription Agreement;



Doc ID: fe2e47e1a2bfb288c303fba5eaee6e5bd7ae9918

(d) if the Subscriber is purchasing the Debentures as trustee or agent for one or more principals, (i) the Subscriber is duly authorized to execute and deliver this Subscription Agreement, to agree to the terms and conditions contained herein and in the Principal Documents and to make the representations, warranties, acknowledgments and covenants made herein and therein, and (ii) the Subscriber acknowledges that the Company may be required by law to disclose, on a confidential basis, to certain regulatory authorities, the identity of such principal or principals for whom the Subscriber may be acting;

(e) the Subscriber is able to certify the information provided in Schedule D, and, if the Subscriber is not an individual, the Subscriber has not been formed, created, established or incorporated for the purpose of permitting the purchase of the Debentures without a prospectus;

(f) the Debentures are being purchased for investment only and not with a view to resale or distribution and will not be resold or otherwise transferred or disposed of except in accordance with the provisions of the applicable securities legislation and the regulations, rules and policies thereunder;

(g) the Subscriber acknowledges that the contents of the Principal Documents and the investments and investment procedures relating to the Company (including its and their respective subsidiaries) are confidential and proprietary and the Subscriber will not distribute any portion of or disclose any matter set forth in the Principal Documents or any information with respect to such investments or procedures other than to its professional advisors or otherwise unless required to do so by law, without the prior written consent of the Company;

(h) the Subscriber has such knowledge and experience in financial and business affairs as to be capable of evaluating the merits and risks of its investment in Debentures and is able to bear the economic risk of loss of such investment;

(i) the Subscriber is aware of the characteristics of the Debentures and of the nature and extent of personal liability associated with an investment in the Debentures;

(j) the Subscriber is not relying on the Company to ensure than an investment in the Company by the Subscriber is suitable for the Subscriber (except as otherwise required of the Company pursuant to applicable securities laws) and based on the information in the Principal Documents and/or the advice of the Subscriber's own advisers (which advice it has had the opportunity to seek), the Subscriber has made that determination;

(k) the Subscriber acknowledges that no prospectus has been filed with any securities commission or other regulatory authority in connection with the issuance of the Debentures, such issuance is exempted from the prospectus requirements of applicable securities laws and as a result: (i) the Subscriber is restricted from using certain civil remedies which would otherwise be available, (ii) the Subscriber may not receive certain information that would otherwise be required to be provided, and (iii) the Company is relieved from certain obligations that would otherwise apply;

(l) the acknowledgments contained in any forms or documents delivered by the Subscriber under applicable securities laws are true and correct as of the date of execution of this Subscription Agreement, and will be true and correct as of the Closing, and fully and truly state those facts necessary for the Company and the Company to be entitled to rely on the relevant exemptions from the prospectus and comply with applicable registration requirements or exemptions, each within the meaning of applicable securities laws of the province of residence of the Subscriber;

(m) the Company is not, and may never become, and the Debentures may never become convertible, exchangeable or otherwise transferable into or for the securities of, a reporting issuer in any jurisdiction or become listed on any stock exchange



Doc ID: fe2e47e1a2bfb288c303fba5eaee6e5bd7ae9918

(n) the Subscriber acknowledges that the Debentures may not be offered, sold, resold or otherwise transferred to persons in the United States or to "U.S. Persons" (as such term is defined in Regulation S to the United States *Securities Act of 1933*, as amended); and

(o) the Subscriber shall notify the Company immediately if it anticipates that any representation or warranty made by the Subscriber herein will cease to be correct or if it becomes aware that any such representation or warranty has ceased to be correct.

The representations, warranties, covenants and acknowledgements of the Subscriber contained in this Subscription Agreement shall survive the completion of the purchase and sale of the Debentures.

**3. Representations, Warranties and Covenants of the Company**

The Company represents and warrants to the Subscriber as follows:

(a) the Company is a valid and subsisting Company duly continued, and in good standing under the laws of Cayman Islands the with all the requisite corporate power and capacity to carry on its business as now conducted and as presently proposed to be conducted by it and to own its assets;

(b) the Company is conducting its business in material compliance with all applicable laws, rules and regulations of each jurisdiction in which its business is carried on and is duly licensed, registered or qualified in all jurisdictions in which it owns, leases or operates its property or carries on business to enable its business to be carried on as now conducted and its property and assets to be owned, leased and operated and all such licences, registrations and qualifications are and will at the Closing Time be valid, subsisting and in good standing, except in respect of matters which do not and will not result in any adverse material change and except for the failure to be so qualified or the absence of any such license, registration or qualification which does not and will not have a material adverse effect on the assets or properties, business, results of operations, prospects or condition (financial or otherwise) of the Company;

(c) the Company has all of the required corporate power and authority to (i) create, issue and sell the Debentures and (ii) enter into this Subscription Agreement and to carry out the provisions of this Subscription Agreement;

(d) upon acceptance by the Company, this Subscription Agreement shall have been duly authorized, executed and delivered by, and constitutes a legal valid and binding agreement of, the Company enforceable against the Company in accordance with its terms, except as the enforceability thereof may be limited by (i) bankruptcy, insolvency, moratorium or similar laws affecting creditor's rights generally, (ii) general equitable principles, or (iii) limitations under applicable law in respect of rights of indemnity, contribution and waiver of contribution;

(e) the execution of this agreement and the issue and sale of the Debentures by the Company does not and will not conflict with, and does not and will not result in a breach of, any of the terms of its constating documents or any agreement or instrument to which the Company or its assets is a party or otherwise bound; and

(f) no approval, authorization, consent or other order of, and no filing, registration or recording with, any governmental authority (other than those which have been or will, as of Closing have been obtained by the Company) is required by the Company in connection with the execution and delivery or with the performance by the Company of this Subscription Agreement.



Doc ID: fe2e47e1a2bfb288c303fba5eaee6e5bd7ae9918

**4. Fees and Commissions**

No fees or commissions are expected to be, nor shall they be, paid by the Company to any third parties in respect of brokerage or introduction of the Debenture.

**5. Personal Information**

The Subscriber acknowledges and consents to the fact that the Company is collecting the Subscriber's (and any beneficial purchaser for which the Subscriber is contracting hereunder) personal information (as that term is defined under applicable privacy legislation) and any other applicable similar replacement or supplemental provincial or federal legislation or laws in effect from time to time) for the purpose of completing the Subscriber's subscription. The Subscriber acknowledges and consents to the Company retaining the personal information for so long as permitted or required by applicable law or business practices. The Subscriber further acknowledges and consents to the fact that the Company may be required by applicable securities laws, stock exchange rules to provide regulatory authorities any personal information provided by the Subscriber respecting itself (and any beneficial purchaser for which the Subscriber is contracting hereunder). The Subscriber represents and warrants that it has the authority to provide the consents and acknowledgements set out in this paragraph on behalf of all beneficial purchasers for which the Subscriber is contracting (if any). In addition to the foregoing, the Subscriber agrees and acknowledges that the Company may use and disclose the Subscriber's personal information, or that of each beneficial purchaser for whom the Subscriber are contracting hereunder, as follows: (a) for internal use with respect to managing the relationships between and contractual obligations of the Company and the Subscriber or any beneficial purchaser for whom the Subscriber is contracting hereunder; (b) for use and disclosure to the Company's transfer agent and registrar; (c) for use and disclosure for income tax related purposes, including without limitation, where required by law, disclosure to the tax authorities; (d) disclosure to securities regulatory authorities and other regulatory bodies with jurisdiction with respect to reports of trade and similar regulatory filings; (e) disclosure to a governmental or other authority to which the disclosure is required by court order or subpoena compelling such disclosure and where there is no reasonable alternative to such disclosure; (f) disclosure to professional advisers of the Company in connection with the performance of their professional services; (g) disclosure to any person where such disclosure is necessary for legitimate business reasons and is made with the Subscriber's prior written consent; (h) disclosure to a court determining the rights of the parties under this Subscription Agreement; and (i) for use and disclosure as otherwise required or permitted by law.

**6. Survival**

This Subscription Agreement, including the representations, warranties and covenants contained herein, shall survive and continue in full force and effect and be binding upon the Company and the Subscriber for a period of 36 (thirty-six) months from Closing notwithstanding the completion of the purchase of the Debentures.

**7. Governing Law**

This agreement shall be governed by and construed in accordance with the laws of the Cayman Islands, without regard to conflict of laws rules. Any dispute arising under this agreement shall be subject to the non-exclusive jurisdiction of the courts of the Cayman Islands.

**8. Costs**

Some or all costs and expenses incurred by the Company (including any fees and disbursements of professional advisors retained by the Company) may be paid out of the proceeds of the Offering received by the Company.

**9. Assignment and Enurement**

The terms and provisions of this Subscription Agreement shall be binding upon and shall enure to the benefit of the parties hereto and their respective successors and permitted assigns; provided that, except as otherwise herein



Doc ID: fe2e47e1a2bfb288c303fba5eaee6e5bd7ae9918

provided, the Subscriber may not assign any of its rights or obligations hereunder without the prior written consent of the Company.

Upon acceptance, this Subscription Agreement contains the entire agreement of the parties hereto relating to the subject matter hereof and there are no representations, covenants or other agreements relating to the subject matter hereof except as stated or referred to herein. This Subscription Agreement may be amended or modified only by a written instrument signed by both parties.

**10. Severance**

If any provision of this Subscription Agreement is determined to be void or unenforceable in whole or in part, it shall be deemed not to affect or impair the validity of any other provision of this Subscription Agreement and such void or unenforceable provision shall be severable from this Subscription Agreement.

**11. Counterparts and Electronic Delivery**

This Subscription Agreement may be executed in two or more counterparts, each of which shall be deemed to be an original and all of which together shall constitute one and the same agreement.

The Company shall be entitled to rely on delivery of an electronic copy of this Subscription Agreement, and acceptance by the Company of an electronic copy of this Subscription Agreement shall create a legal, valid and binding agreement between the parties.

**12. Time of Essence**

Time shall be of the essence of this Subscription Agreement.

**13. Language**

The parties hereto confirm their express wish that this Subscription Agreement and all documents and agreements directly or indirectly relating hereto be drawn up in the English language.

**14. Anti-Money Laundering and Anti-Terrorist Financing Legislation**

In order to comply with legislation applicable to the Company aimed at the prevention of money laundering and terrorism financing ("Anti-Money Laundering Laws"), the Company may require additional information concerning investors from time to time, and the Subscriber agrees to provide all such information. the Subscriber hereby represents, warrants and agrees that, to the best of the Subscriber's knowledge, based upon appropriate diligence and investigation, none of the monies that the Subscriber will contribute to the Company shall be derived from, or related to, directly or indirectly, any activity that is deemed criminal under applicable law, or derived from or related to, directly or indirectly, any individual or organization identified as a terrorist or a terrorist organization by the United Nations or the governments of the Cayman Islands or the United States; and no contribution or payment by the Subscriber to the Company, to the extent that such contribution or payment is within the Subscriber's control, shall cause the Company to be in violation of any Anti-Money Laundering Laws.

The Subscriber acknowledges that the Subscriber has reviewed the definition of "politically exposed foreign person" in the applicable Investor Information Form and has disclosed in such Investor Information Form whether the Subscriber or any applicable person associated with or related to the Subscriber is a politically exposed foreign person. The Subscriber will immediately notify the Company if the status of any such person in this regard changes.

The Subscriber acknowledges that if, as a result of any information or other matter which comes to the Company's attention, any director, officer or employee of the Company, or their professional advisers, knows or suspects that an investor is engaged in money laundering, such person is required to report such information or other matter to the relevant authorities and such report shall not be treated as a breach of any restriction upon the disclosure of the information imposed by Cayman Islands law or otherwise.

**[*The remainder of this page is intentionally left blank.*]**



Doc ID: fe2e47e1a2bfb288c303fba5eaee6e5bd7ae9918

# SCHEDULE B

## EQICORP LIMITED

## UP TO US$500,000 IN CONVERTIBLE DEBENTURE UNITS
## INDICATIVE TERM SHEET

## NOT FOR GENERAL DISTRIBUTION IN THE UNITED STATES

*This term sheet (the "Term Sheet") summarizes the principal terms of a proposed offering of up to US$500,000 of convertible debenture units of EQICORP Limited to certain qualified subscribers (each such subscriber, an "Investor") pursuant to a private placement.*

*This Term Sheet is for discussion purposes only. This Term Sheet is not intended to represent an "offering memorandum" for purposes of applicable securities legislation. Any investment by the Investor will be in all respects contingent upon and subject to, among other things, satisfactory completion of due diligence and the negotiation of satisfactory documentation.*

---

**Issuer:** EQICORP Limited (the "**Company**");

**Offering:** Private placement of that number of convertible debenture units of the Company (the "**Debenture Units**") to finance up to US$500,000 of technical development costs for EQIBank Limited (the "**Offering**");

**Closing Date** On or about February 4, 2022

**Issue Price:** US$1 per Debenture Unit (the "**Issue Price**");

**Conversion to Equity:**

*(a) Automatic Conversion*. In the event that payment of the outstanding Principal Amount is not made on or before the Maturity Date (and subject to and upon compliance with the provisions of this Article 3), the Company shall, convert all, but not less than all of the outstanding Principal Amount under this Debenture into Common Shares at the Conversion Price (an "**Automatic Conversion**") as set out below

*(b) Requested Conversion.* At any time up until the Maturity Date, the Subscriber may request the Company to convert the whole or part of the outstanding Principal Amount into Common Shares at the Conversion Price (a "**Requested Conversion**")

*(c) Conversion Price*. The conversion price per Common Share issuable on an Automatic Conversion shall be a USD valuation which equates USD500,000 with 3,659 Common Shares of the Company.

The above Conversion Price is agreed to by the Company and the Subscriber as follows:

i. EQITrade Limited (**"EQITrade"**) has a deemed valuation of USD 35,000,000
ii. EQITrade has 15,369,694 ordinary and preferred shares issued and outstanding, out of which 3,000,000 shares belong to EQICORP
iii. EQICORP has 50,000 ordinary shares issued and outstanding, which means that EQICORP holds 3,000,000/15,369,694 x $35,000,000 = $6,831,626 value in EQITrade.
iv. each share of EQICORP is therefore worth USD 136.63 ($6,831,626 / 50,000 = $136.63)
v. Conversion of USD 500,000 would therefore represent 3,659 of EQICORP shares ($500,000/$136.63 = 3,659)



Doc ID: fe2e47e1a2bfb288c303fba5eaee6e5bd7ae9918

| | |
|---|---|
| | *(d) Accrued Interest*. Upon any Automatic Conversion, the Company may, at its own discretion, settle any accrued and unpaid interest by the issuance, at the Conversion Price, of that number of Common Shares whose value is equal to 100% of the amount of such unpaid interest using conversion ratio defined in section above. |
| **Maturity Date:** | The Convertible Debentures shall mature on the date that is 36 (thirty-six) months from the Closing Date; |
| **Interest:** | The Convertible Debentures shall bear interest at a rate of 0% per annum from the Closing Date. Any interest payable hereunder shall automatically accrue and be capitalized to the principal amount of the Convertible Debentures, and shall thereafter the deemed to be part of the principal amount of the Convertible Debenture; |
| **Payment of Subscription Proceeds:** | Subscription proceeds shall be paid in kind. The Subscriber shall perform technical development work for EQIBank Limited including but not limited to (i) automation of onboarding of new clients, (ii) automation of processing of banking payments and deposits, (iii) creation and automation of Banking as a Service ("**BaaS**") platform, and (iv) improvements to clients banking interface, as previously discussed in detail between the Company and the Subscriber. The Subscriber shall issue to the Company invoices for its work performed, at cost, without profit markup. Subject to the Company's acceptance of technical work performed by the Subscriber, such invoices shall be treated as subscription proceeds of the Offering paid by the Subscriber and shall increase the amount of the Convertible Debentures of up to USD$500,000. |
| **Eligibility:** | Not eligible for RRSP, RESP, RRIF, TFSA and DPSP accounts; |
| **Cash Commission:** | None. |

**SCHEDULE C**
**DELETED**

[***The remainder of this page is intentionally left blank.***]



Doc ID: fe2e47e1a2bfb288c303fba5eaee6e5bd7ae9918

## SCHEDULE D

**ADDITIONAL REPRESENTATIONS, WARRANTIES, COVENANTS AND INFORMATION OF U.S. PERSONS**

**TO: EQICORP LIMITED (the "Issuer")**

**RE: SUBSCRIPTION FOR SECURITIES OF THE ISSUER**

Capitalized terms not specifically defined in this certification have the meaning ascribed to them in the Subscription Agreement to which this Schedule D is attached. In the event of a conflict between the terms of this certification and such Subscription Agreement, the terms of this certification shall prevail.

In addition to the covenants, representations and warranties contained in the Subscription Agreement to which this Schedule D is attached, the undersigned Subscriber covenants, represents and warrants to the Issuer that:

(a) It is (i) a U.S. Person or a person in the United States and (ii) authorized to consummate the purchase of the Securities.

(b) It has such knowledge, skill and experience in financial, investment and business matters as to be capable of evaluating the merits and risks of an investment in the Securities and it is able to bear the economic risk of loss of its entire investment. To the extent necessary, the Subscriber has retained, at his or her own expense, and relied upon, appropriate professional advice regarding the investment, tax and legal merits and consequences of the Subscription Agreement and owning Securities.

(c) The Issuer has provided to it the opportunity to ask questions and receive answers concerning the terms and conditions of the offering and it has had access to such information concerning the Issuer as it has considered necessary or appropriate in connection with its investment decision to acquire the Securities, including access to the Issuer's public filings available on the Internet at www.sedar.com, and that any answers to questions and any request for information have been complied with to the Subscriber's satisfaction.

(d) It is acquiring the Securities for its own account, or for the account of one or more persons for whom it is exercising sole investment discretion (a "Beneficial Purchaser"), for investment purposes only and not with a view to any resale, distribution or other disposition of the Securities in violation of the United States securities laws.

(e) The address of the Subscriber set out on page 1 of the Subscription Agreement is the true and correct principal address of the Subscriber and can be relied on by the Issuer for the purposes of state blue-sky laws and the Subscriber has not been formed for the specific purpose of purchasing the Securities.

(f) It understands that (i) the Securities have not been and will not be registered under the United States Securities Act of 1933, as amended (the "U.S. Securities Act") or the securities laws of any state of the United States and will be "restricted securities", as defined in Rule 144 under the U.S. Securities Act; (ii) the offer and sale of Securities contemplated hereby is being made in reliance on an exemption from such registration requirements in reliance on Rule 506(b) of Regulation D under the U.S. Securities Act and/or Section 4(a)(2) of the U.S. Securities Act; and (iii) subject to certain exceptions provided under the U.S. Securities Act, the Securities may not be transferred or exercised unless such Securities are registered under the U.S. Securities Act and applicable state securities laws, or unless an exemption from such registration requirements is available.

(g) The Subscriber is, and if applicable, each Beneficial Purchaser for whose account it is purchasing the Securities is, an "accredited investor" as defined in Rule 501(a) of Regulation D under the U.S. Securities Act by virtue of meeting one of the following criteria (**please write "SUB" for the criteria the Subscriber meets and "BEN" for the criteria any persons for whose account or benefit the Subscriber is purchasing the Securities meet**):

| | |
|---|---|
| 1.<br>Initials _______ | A bank, as defined in Section 3(a)(2) of the U.S. Securities Act, whether acting in its individual or fiduciary capacity; or |
| 2.<br>Initials _______ | A savings and loan association or other institution as defined in Section 3(a)(5)(A) of the U.S. Securities Act, whether acting in its individual or fiduciary capacity; or |
| 3.<br>Initials _______ | A broker or dealer registered pursuant to Section 15 of the United States *Securities Exchange Act of 1934*; or |
| 4.<br>Initials _______ | An insurance company as defined in Section 2(a)(13) of the U.S. Securities Act; or |
| 5.<br>Initials _______ | An investment company registered under the United States *Investment Company Act of 1940*; or |
| 6.<br>Initials _______ | A business development company as defined in Section 2(a)(48) of the United States *Investment Company Act of 1940*; or |
| 7.<br>Initials _______ | A small business investment company licensed by the U.S. Small Business Administration under Section 301 (c) or (d) of the United States *Small Business Investment Act of 1958*; or |
| 8.<br>Initials _______ | A plan established and maintained by a state, its political subdivisions or any agency or instrumentality of a state or its political subdivisions, for the benefit of its employees, with total assets in excess of US$5,000,000; or |
| 9.<br>Initials _______ | An employee benefit plan within the meaning of the United States *Employee Retirement Income Security Act of 1974* in which the investment decision is made by a plan fiduciary, as defined in Section 3(21) of such Act, which is either a bank, savings and loan association, insurance company or registered investment adviser, or an employee benefit plan with total assets in excess of US$5,000,000 or, if a self-directed plan, with investment decisions made solely by persons who are Accredited Investors; or |
| 10.<br>Initials _______ | A private business development company as defined in Section 202(a)(22) of the United States *Investment Advisers Act of 1940*; or |
| 11.<br>Initials _______ | An organization described in Section 501(c)(3) of the United States *Internal Revenue Code*, a corporation, a Massachusetts or similar business trust, or a partnership, not formed for the specific purpose of acquiring the Securities offered, with total assets in excess of US$5,000,000; or |
| 12.<br>Initials _______ | Any director or executive officer of the Issuer; or |
| 13.<br>Initials ___X____ | A natural person whose individual net worth, or joint net worth, with that person's spouse, exceeds US$1,000,000 as determined on the following basis:<br>(i) the person's primary residence shall not be included as an asset;<br>(ii) indebtedness that is secured by the person's primary residence, up to the estimated fair market value of the primary residence at the time of the sale and purchase of securities contemplated by the accompanying Subscription Agreement, shall not be included as a liability (except that if the amount of such indebtedness outstanding at such time exceeds the amount outstanding 60 days before such time, other than as a result of the acquisition of the primary residence, the amount of such excess shall be included as a liability); and<br>(iii) indebtedness that is secured by the person's primary residence in excess of the estimated fair market value of the primary residence shall be included as a liability; or |
| 14.<br>Initials _______ | A natural person who had an individual income in excess of US$200,000 in each of the two most recent years or joint income with that person's spouse in excess of |



Doc ID: fe2e47e1a2bfb288c303fba5eaee6e5bd7ae9918

US$300,000 in each of those years and has a reasonable expectation of reaching the same income level in the current year; or

15. Initials _______ A trust, with total assets in excess of US$5,000,000, not formed for the specific purpose of acquiring the Securities offered, whose purchase is directed by a sophisticated person as described in Rule 506(b)(2)(ii) under the U.S. Securities Act; or

16. Initials _______ Any entity in which all of the equity owners meet the requirements of at least one of the above categories (if this alternative is checked, you must identify each equity owner and provide statements signed by each demonstrating how each qualifies as an accredited investor).

(h) The Subscriber has not purchased the Securities as a result of any form of general solicitation or general advertising (as those terms are used in Regulation D under the U.S. Securities Act), including advertisements, articles, notices or other communications published in any newspaper, magazine or similar media or broadcast over radio or television, or other form of telecommunications, including electronic display, or any seminar or meeting whose attendees have been invited by general solicitation or general advertising.

(i) If the Subscriber decides to offer, sell or otherwise transfer any of the Securities, it will not offer, sell or otherwise transfer any of such Securities directly or indirectly, unless:

(i) the sale is to the Issuer;
(ii) the sale is made outside the United States in a transaction meeting the requirements of Rule 904 of Regulation S under the U.S. Securities Act and in compliance with applicable local laws and regulations;
(iii) the sale is made pursuant to the exemption from the registration requirements under the U.S. Securities Act provided by Rule 144 thereunder, if available, and in accordance with any applicable state securities or "blue sky" laws; or
(iv) the securities are sold in a transaction that does not require registration under the U.S. Securities Act or any applicable state laws and regulations governing the offer and sale of securities,

and, in the case of each of (iii) and (iv) it has prior to such sale furnished to the Issuer an opinion of counsel reasonably satisfactory to the Issuer stating that such transaction is exempt from registration under applicable securities laws and that the legends referred to in paragraph (1) below may be removed.

(j) It understands and agrees that the Securities may not be acquired in the United States by or on behalf of a U.S. Person or a person in the United States unless registered under the U.S. Securities Act and any applicable state securities laws or unless an exemption from such registration requirements is available.

(k) It acknowledges that it has not purchased the Securities as a result of, and will not itself engage in, any "directed selling efforts" (as defined in Regulation S under the U.S. Securities Act) in the United States in respect of the Securities which would include any activities undertaken for the purpose of, or that could reasonably be expected to have the effect of, conditioning the market in the United States for the resale of the Securities.

(l) The certificates representing the Securities, as well as all certificates issued in exchange for or in substitution of the foregoing, until such time as is no longer required under the applicable requirements of the U.S. Securities Act or applicable state securities laws, will bear, on the face of such certificate, the following legend:

> "THE SECURITIES REPRESENTED HEREBY HAVE NOT BEEN REGISTERED UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED (THE "U.S. SECURITIES ACT") OR THE SECURITIES LAWS OF ANY STATE OF THE UNITED STATES. THE HOLDER HEREOF, BY PURCHASING SUCH SECURITIES, AGREES FOR THE BENEFIT OF THE COMPANY THAT SUCH SECURITIES MAY



Doc ID: fe2e47e1a2bfb288c303fba5eaee6e5bd7ae9918

> BE OFFERED, SOLD OR OTHERWISE TRANSFERRED ONLY (A) TO THE COMPANY; (B) OUTSIDE THE UNITED STATES IN ACCORDANCE WITH RULE 904 OF REGULATION S UNDER THE U.S. SECURITIES ACT; (C) IN ACCORDANCE WITH THE EXEMPTION FROM REGISTRATION UNDER THE U.S. SECURITIES ACT PROVIDED BY RULE 144 THEREUNDER, IF AVAILABLE, AND IN COMPLIANCE WITH ANY APPLICABLE STATE SECURITIES LAWS; OR (D) IN A TRANSACTION THAT DOES NOT REQUIRE REGISTRATION UNDER THE U.S. SECURITIES ACT AND ANY APPLICABLE STATE SECURITIES LAWS, AND, IN THE CASE OF PARAGRAPH (C) OR (D), THE SELLER FURNISHES TO THE COMPANY AN OPINION OF COUNSEL OF RECOGNIZED STANDING IN FORM AND SUBSTANCE SATISFACTORY TO THE COMPANY TO SUCH EFFECT.

provided, that if the shares are being sold outside the United States in compliance with the requirements of Rule 904 of Regulation S at a time when the Issuer is a "foreign issuer" as defined in Regulation S at the time of sale, the legend set forth above may be removed by providing an executed declaration to the registrar and transfer agent of the Issuer, in substantially the form set forth as Appendix A attached hereto (or in such other forms as the Issuer may prescribe from time to time) and, if requested by the Issuer or the transfer agent, an opinion of counsel of recognized standing in form and substance satisfactory to the Issuer and the transfer agent to the effect that such sale is being made in compliance with Rule 904 of Regulation S; and provided, further, that, if any shares are being sold otherwise than in accordance with Regulation S and other than to the Issuer, the legend may be removed by delivery to the registrar and transfer agent and the Issuer of an opinion of counsel, of recognized standing reasonably satisfactory to the Issuer, that such legend is no longer required under applicable requirements of the U.S. Securities Act or state securities laws.

(m) It understands and agrees that there may be material tax consequences to the Subscriber of an acquisition, disposition or exercise of any of the Securities. The Issuer gives no opinion and makes no representation with respect to the tax consequences to the Subscriber under United States, state, local or foreign tax law of the undersigned's acquisition, disposition or exercise of such Securities; in particular, no determination has been made whether the Issuer will be a "passive foreign investment company" within the meaning of Section 1297 of the United States Internal Revenue Code.

(n) It understands and acknowledges that the Issuer is incorporated outside the United States and certain of its properties are located outside the United States. Consequently, it may be difficult to provide service of process on the Issuer and it may be difficult to enforce any judgment against the Issuer.

(o) It understands that (i) the Issuer may be deemed to be an issuer that is, or that has been at any time previously, an issuer with no or nominal operations and no or nominal assets other than cash and cash equivalents (a "Shell Company"), (ii) if the Issuer is deemed to be, or to have been at any time previously, a Shell Company, Rule 144 under the U.S. Securities Act may not be available for resales of the Securities and (iii) the Issuer is not obligated to make Rule 144 under the U.S. Securities Act available for resales of the Securities.

(p) It understands and agrees that the financial statements of the Issuer have been prepared in accordance with International Financial Reporting Standards and therefore may be materially different from financial statements prepared under U.S. generally accepted accounting principles and therefore may not be comparable to financial statements of United States companies.

(q) It consents to the Issuer making a notation on its records or giving instructions to any transfer agent of the Issuer in order to implement the restrictions on transfer set forth and described in this certification and the Subscription Agreement.

(r) It understands that the Securities are "restricted securities" under applicable federal securities laws and that the U.S. Securities Act and the rules of the United States Securities and Exchange Commission (the "SEC") provide in substance that the Subscriber may dispose of the Securities only pursuant to an effective registration statement under the U.S. Securities Act or an exemption therefrom, and, other than as set out herein, the Subscriber understands that the Issuer has no obligation to register any of the Securities or to take action so as to permit sales pursuant to the U.S. Securities Act (including Rule 144 thereunder). Accordingly, the Subscriber understands that absent registration, under the rules of the SEC, the Subscriber may be required to hold the Securities indefinitely or to transfer the Securities in transactions which are exempt from



Doc ID: fe2e47e1a2bfb288c303fba5eaee6e5bd7ae9918

registration under the U.S. Securities Act, in which event the transferee will acquire "restricted securities" subject to the same limitations as in the hands of the Subscriber. As a consequence, the Subscriber understands that it must bear the economic risks of the investment in the Securities for an indefinite period of time.

(s) It understands and acknowledges that the Issuer (i) is not obligated to remain a "foreign issuer" within the meaning of Regulation S under the U.S. Securities Act, (ii) may not, at the time the Securities are resold by it or at any other time, be a foreign issuer and (iii) may engage in one or more transactions which could cause the Issuer not to be a foreign issuer, and if the Issuer is not a foreign issuer at the time of the sale or transfer of the Securities pursuant to Rule 904 of Regulation S, the certificates representing the Securities may continue to bear the legend described above.

(t) It has no intention to distribute, and shall not transfer, either directly or indirectly any of the Securities to any person within the United States or to U.S. persons except pursuant to an effective registration statement under the U.S. Securities Act, or an exemption therefrom.

**ONLY U.S. PURCHASERS NEED COMPLETE AND SIGN**

Dated February 3, 2022.

**X** ________________________________________
Signature of individual (if Subscriber **is** an individual)

**X** ________________________________________
Authorized signatory (if Subscriber is **not** an individual)

**Beyond Enterprizes LLC**
________________________________________
Name of Subscriber (**please print**)

**Bulent Brad Yasar**
________________________________________
Name of authorized signatory (**please print**)

**Director**
________________________________________
Official capacity of authorized signatory (**please print**)



Doc ID: fe2e47e1a2bfb288c303fba5eaee6e5bd7ae9918

**SCHEDULE E**

**CERTIFICATE OF NON-CANADIAN AND NON-U.S. INVESTORS**

**DELETED**

**SCHEDULE F**

**PAYMENT INSTRUCTIONS**

**DELETED**

**[*The remainder of this page is intentionally left blank.*]**

HELLOSIGN

# Audit trail

| | |
|---|---|
| **TITLE** | Beyond Enterprizes LLC - Subscription Agreement (2022-02-03)... |
| **FILE NAME** | Beyond Enterprize... D v6 (AK CL.docx |
| **DOCUMENT ID** | fe2e47e1a2bfb288c303fba5eaee6e5bd7ae9918 |
| **AUDIT TRAIL DATE FORMAT** | MM / DD / YYYY |
| **STATUS** | ● Signed |

## Document history

| | | |
|---|---|---|
| SENT | **02 / 03 / 2022**<br>17:13:29 UTC | Sent for signature to Brad Yasar (brad@beyondenterprizes.com) and Christopher Burke (c.burke@eqibank.com) from adam@arkorion.ca<br>IP: 208.114.129.31 |
| VIEWED | **02 / 03 / 2022**<br>17:38:13 UTC | Viewed by Brad Yasar (brad@beyondenterprizes.com)<br>IP: 192.109.205.168 |
| SIGNED | **02 / 03 / 2022**<br>17:39:00 UTC | Signed by Brad Yasar (brad@beyondenterprizes.com)<br>IP: 192.109.205.168 |
| VIEWED | **02 / 03 / 2022**<br>17:43:15 UTC | Viewed by Christopher Burke (c.burke@eqibank.com)<br>IP: 208.168.237.56 |
| SIGNED | **02 / 03 / 2022**<br>17:43:41 UTC | Signed by Christopher Burke (c.burke@eqibank.com)<br>IP: 208.168.237.56 |
| COMPLETED | **02 / 03 / 2022**<br>17:43:41 UTC | The document has been completed. |